IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

JUDITH A. KELLER,

  Plaintiff,

vs.               CIV No. 00-1667 MV/LFG

BOARD OF EDUCATION OF THE
CITY OF ALBUQUERQUE, NEW
MEXICO, and BRADFORD ALLISON,

  Defendants.


## MEMORANDUM OPINION AND ORDER

  THIS MATTER comes before the Court on Defendants' Amended Motion for Summary Judgment **[Doc. No. 42]**. The Court, after considering the motion, responses, relevant law, and otherwise being fully informed, finds that the motions will be **GRANTED in part** as to claims under 42 U.S.C. § 1983 and otherwise **DENIED.**


## BACKGROUND

  Plaintiff brought this action against Defendants in the Second Judicial District Court, County of Bernalillo, State of New Mexico. The matter was removed to Federal Court pursuant to 28 U.S.C. § 1441(c). Plaintiff's complaint seeks damages under Title VII ("Title VII") of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 1981a, 2000e-2, and 2000e-5, the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12112, 12117, 12132, 12133, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 623 and 626, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, 42 U.S.C. § 1983, the

1

New Mexico Human Rights Act ("NMHRA") N.M. Stat. Ann. §§ 28-1-1 *et seq.*, and state contract law.

As this is a defendants' Motion for Summary Judgment, the following facts are construed in favor of the Plaintiff, Dr. Keller. This case arises from Defendants' removal of Dr. Keller from her position as Assistant Superintendent of Human Resources for the Albuquerque Public Schools ("APS"). Dr. Keller began working at APS in 1982. In August 1994, she was promoted to the position of Assistant Superintendent of Human Resources. In July 1998, Dr. Keller was notified by APS Superintendent Bradford Allison that she was to be terminated from her position as of head of human resources. At that time, the main justification for her termination given by the Superintendent was that many members of the Board were displeased with her, and that she was being removed for political reasons.

Dr. Allison suggested that Dr. Keller seek a low-level position within APS, but outside of human resources, for the 1998-1999 school year. Despite this conversation, in September 1988, Defendants and Dr. Keller executed an employment contract which provided for her employment as Executive Director of Human Resources for the 1998-1999 school year. This contract specified that termination was to be for cause only. Nonetheless, Defendants removed Dr. Keller from her position approximately nine days later. In October, 1998, prior to her removal from her position in Human Resources, Dr. Keller asked if she should stay in Human Resources until the position was filled. Dr. Allison told her that she should move to RDA, even though APS had yet to select her replacement.

Plaintiff's former position remained unfilled until January 1999, at which time Defendants hired Ms. Gena Jones. Ms. Jones had no experience in the field of education, and significantly

less experience than Plaintiff in human resources and management. Ms. Jones was not hired during a first round of interviews. The position remained open through a second round of interviews, at which time Ms. Jones was hired. Ms. Jones is approximately twenty-four years younger than Dr. Keller, and is not known to have a disability.

Dr. Keller created a position for herself in the APS Research, Development and Accountability Department ("RDA") for the remainder of the school year. She had no job responsibilities, no supervisor, and no job classification or title. Her office was located in a former supply closet. At this time, Dr. Keller began an independent study of the correlation between high-school drop-outs and standardized test results in elementary school.

In March 1999, Dr. Keller was diagnosed with breast cancer. Dr. Keller immediately discussed her diagnosis with Dr. Allison. Dr. Allison allegedly responded by telling Dr. Keller about many women he knew who had been diagnosed with breast cancer and subsequently died from the illness. Furthermore, in this meeting he stated that she would have to leave APS, or at a minimum, her salary would have to be "cut."

A few days later, APS Compensation Manager Dan Noble informed Plaintiff he had been instructed to place her position at RDA at a salary level that would represent a fifty-five percent (55%) reduction in her salary. With this reduction, Dr. Keller's salary would supply less compensation than her retirement. Thus, she chose to retire. Dr. Keller was the only Cabinet level employee to be removed from a Cabinet position during the 1998-1999 school year. She was the oldest Cabinet-level employee, the oldest female Cabinet-level employee by a substantial margin, and the only Cabinet-level employee to be diagnosed with breast cancer.

Following her demotion, Dr. Keller was given a variety of reasons for her removal from

her position as head of human resources.  Initially, Dr. Allison told her that he was removing her for political reasons, and that she had fallen into disfavor with many members of the board.  When the case went before the EEOC, Defendants stated that Dr. Keller was removed because APS wanted someone more "professional" in the position, with experience outside the New Mexico School District.  Next, in his interrogatories, Dr. Allison stated that Plaintiff requested her demotion from her job as head of human resources.  Finally, Richard Toledo, at all relevant times a member of the Board of Education, refuted all of Dr. Allison's earlier explanations and testified that Dr. Keller was removed for the sole reason that Dr. Allison insisted on her removal and the Board acquiesced.

Plaintiff claims that prior to learning of Dr. Keller's age and disability, Dr. Allison promised Dr. Keller that her contract for her position as head of Human Services would be renewed.   Dr. Allison frequently made comments about needing "new blood" in APS to Dr. Keller.   In deposition testimony, high-level administrators and APS Board members noted that Dr. Allison preferred to hire younger, attractive women.  Deposition testimony contains allusions to inappropriate interactions between Dr. Allison and his younger female staff members or interns.

The "save harmless" policy, which allows demoted employees to retain their salary level until the end of the school year, was allegedly created to address the emotional distress experienced by employees during significant employment changes.  Under this plan, Dr. Keller retained the salary received as Assistant Superintendent during her time with RDA.

It appears that in the past, while employees in APS were required to enter into a new contract at the beginning of every school year, these were considered routine renewals, and

employees were rehired unless they were to be terminated for cause. In deposition testimony, Plaintiff claimed that since the early 1980's, an APS employee could expect to be retained unless there was cause for not renewing the employment contract each year. Thus, while there is nothing explicit in the contract terms which would give rise to this expectation, APS appears to have maintained the practice of routine renewals and terminations only for cause.

The treatment for Dr. Keller's breast cancer includes taking tamoxifen. A side effect of this drug is the drying and thinning of vaginal tissue, which renders vaginal intercourse painful.

## STANDARD OF REVIEW

Summary judgment is an integral part of the Federal Rules of Civil Procedure, which are intended to "'secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1). Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when the Court, viewing the record in the light most favorable to the non-moving party, determines that "there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law." *Thrasher v. B&B Chemical Co.*, 2 F.3d 995, 996 (10th Cir. 1993).

The moving party bears the initial burden of showing that "there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991). Once the moving party meets this burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. "Where the record taken as a whole could not

lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Although the material submitted by the parties in support of and in opposition to the motion must be construed liberally in favor of the party opposing the motion, *see Harsha v. United States*, 590 F.2d 884, 887 (10th Cir. 1979), the burden on the moving party may be discharged by demonstrating to the district court that there is an absence of evidence to support the nonmoving party's position. *Celotex*, 477 U.S. at 325. In such a situation, the moving party is entitled to judgment as a matter of law.

## DISCUSSION

Defendants raise a number of arguments for granting summary judgment. The Court will address each in turn.

I.      Plaintiff's *Prima Facie* Case for Claims under Title VII, ADA, ADEA, and NMHRA

To succeed on a Title VII, ADA, ADEA, and NMHRA claims, a plaintiff must first establish a *prima facie* case of discrimination by showing that (1) she belongs to a class protected by each statute; (2) she suffered an adverse employment action; (3) she was qualified for her position; and (4) she was treated less favorably than others not in the class. *Sanchez v. Denver Public Schools*, 164 F.3df 527 (10th Cir. 1998) (citing *Thomas v. Denny's Inc.*, 111 F.3d 1506, 1510 (10th Cir. 1997).

A.      Plaintiff's Status as a Disabled Person for Purposes of the ADA and NMHRA

The ADA and NMHRA prohibit discrimination based on a qualified individual's  disability in regard to hiring, advancement, compensation, or discharge. 42 U.S.C. §12122(a); NMSA 1978, §28-1-2. To establish a *prima facie* case of disability discrimination under the ADA or

NMHRA, Plaintiff must show that she is disabled. *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir. 1997) (citations omitted); *Kitchell v. PNM*, 126 N.M. 525, 527 (1998). Within the meaning of the ADA and NMHRA, a disability is "a physical or mental impairment that substantially limits one or more of the major life activities of such individual . . . or . . . being regarded as having such impairment." 42 U.S.C. § 12102(2); NMSA 1978, § 28-1-2(M). Plaintiff has claimed that her breast cancer has "substantially limited" her major life activities of work and sex.

Plaintiff was diagnosed with breast cancer on March 5, 1999. The treatment for her disease includes taking the prescription medication tamoxifen. Tamoxifen prevents estrogen from attaching to receptors on breast cancer cells, and thereby reduces the possibility of estrogen-receptive tumors from spreading or recurring. Estrogen stimulates the growth of breast and uterine tissue. Tamoxifen causes drying and thinning of vaginal tissue, a condition known as atrophic vaginitis, which renders vaginal intercourse painful. Tamoxifen is also known to cause a loss of libido. Therefore, tamoxifen not only potentially causes intercourse to be painful, but may also eliminate any desire for sexual intercourse at all.

Sexual intercourse and reproduction are recognized as major life activities. *Bragdon v. Abbott*, 524 U.S. 624, 638 (1998). Furthermore, many courts have found that cancer is a disability, or at a minimum that such a determination is a question of fact, not law. *Demarah v. Texaco*, 88 F.Supp.2d 1150 (D.Colo. 2000) (finding genuine issues of material fact as to whether former employee whose breast cancer was in remission was substantially limited in the life activities of working, walking, and caring for herself for a sufficient duration so as to be considered disabled, precluded summary judgment on employee's ADA claim); *Wilson v.*

7

*Md.-Nat'l Capital Park & Planning Comm'n,* 178 F.3d 1289 (4th Cir. 1999) (accepting district

court assumption that bladder cancer is a disability); *Berk v. Bates Adver. USA, Inc.*, 25 F. Supp.

2d 265 (S.D.N.Y. 1998) (holding breast cancer is a disability); *Olbrot v. Denny's, Inc.*, 1998 WL

525174 (N.D. Ill. Aug. 19, 1998) (holding issue of whether breast cancer is a disability is a

question of fact); *Bizelli v. Amchem*, 981 F. Supp. 1254 (E.D. Mo. 1997) (holding testicular

cancer is a disability); *Mark v. Burke Rehab. Hosp.*, 1997 WL 189124 (S.D.N.Y. Apr. 17, 1997)

(holding lymphoma is a  disability); *Wojciechowski v. Emergency Technical Servs. Corp.*, 1997

WL 164004 (N.D. Ill. Mar. 27, 1997) (accepting breast cancer in deceased plaintiff as a

disability); *Milton v. Bob Maddox Chrysler Plymouth, Inc.*, 868 F. Supp 320 (S.D. Ga. 1994)

(finding summary judgment inappropriate in case involving bronchial cancer); *Braverman v.*

*Penobscot Shoe Co.*, 859 F. Supp. 596 (D. Me. 1994) (finding summary judgment inappropriate

in case alleging prostate cancer as a disability).

       The limitation on a major life activity must be substantial when compared to the ability of

the "average person in the general population," 29 C.F.R. §1630.2(j)(1)(i).  Plaintiff claims she

has suffered atrophic vaginitis and a loss of libido due to the treatment for her breast cancer.  As a

result, she is substantially limited in participation in a major life activity, that is, sexual intercourse.

Defense counsel argues that Plaintiff's symptoms are no different from other post-menopausal

women.  However, it appears from the pleadings that Plaintiff was post-menopausal prior to her

treatment for cancer, and that her symptoms of atrophic vaginitis and loss of libido resulted of her

treatment for cancer, not from menopause.  Further, Defendants' argument that the over-the-

counter remedies for vaginal dryness suggested by the National Institute of Health for post-

menopausal women is sufficient to mitigate the impairment lacks merit for summary judgment

purposes. Plaintiff underwent surgery to have a cancerous tumor removed from her breast. She takes a medication that causes her to suffer from not only vaginal dryness and thinning of the vaginal walls, but also a loss of libido. The evidence cited by the Defendants, from the "Menopause" website of the National Institute of Health, states that "[f]or some women, *but by no means all,* menopause brings a decrease in sexual activity." Defendants' Exhibit L, p. 3 (emphasis added). This alone raises a genuine issue of material fact as to whether Plaintiff suffers a substantial impairment of her major life activity of sexual intercourse that goes beyond the experience of the average post-menopausal woman. Accordingly, Plaintiff has shown that she is disabled for purposes of her *prima facie* case. As Plaintiff has been shown to have a disability for ADA and NMHRA purposes on the basis of the substantial limitation of her sex life, the Court need not address whether Plaintiff's breast cancer substantially limited her major life activity of work.

Plaintiff also submits in the alternative that she was regarded as having a disability by APS. "A person is regarded as having a disability if (1) a covered entity mistakenly believes that the person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that the person's actual non-limiting impairment substantially limits one or more major life activities." *Doyal v. Oklahoma Heart, Inc.* 213 F.3d 492, 499 (10th Cir. 2000) (citations omitted). Generalized statements do not support the conclusion that management misperceives a person as being substantially limited in a major life activity. *Id.*

Defendants' offer of the Fifth Circuit case *Ellison v. Software Spectrum, Inc.*, 85 F.3d 187 (5th Cir. 1996) is inapposite here. In *Ellison*, Plaintiff's supervisor was not found to have regarded the plaintiff as having a disability, because despite his derogatory and insulting jokes

about her breast cancer, she was offered another position in the company at the onset of her illness, and three other employees were terminated at the same time that she was terminated. Here, the alleged facts paint quite a different picture.   Dr. Keller stated in deposition testimony that upon notifying Dr. Allison of her diagnosis, he became very "cold" and began speaking of women who had died of breast cancer.   He was not merely telling tasteless jokes that had no impact on her employment status.  Rather, he allegedly proceeded to tell her that she could not remain at APS, or at a minimum, would have to take "a salary cut."   Thus, even if Plaintiff were not disabled under the ADA and NMHRA, she has offered sufficient evidence to show she was regarded as having a physical condition that would seriously limit her ability to work at APS. Thus,  Dr. Keller has fully satisfied this prong of her *prima facie* case.

       B.      Adverse Employment Actions

"The Tenth Circuit liberally defines the term 'adverse employment action.'  Such actions are not simply limited to monetary losses in the form of wages or benefits.  Instead we take 'a case-by-case approach,' examining the unique factors relevant to the situation at hand." *Sanchez v. Denver Public Schools*, 164 F.3df 527 (10th Cir. 1998) (citations omitted).   Here, Plaintiff must show more than a "mere inconvenience or an alteration of job responsibilities." *Id.*, citing *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993).

Dr. Keller has shown more than a  "mere inconvenience or an alteration of job responsibilities."  Upon her removal from her position as Assistant Superintendent of Human Resources, she was given no job title or responsibilities, and was told to find herself something to do outside of human resources that was low-profile.  Her new office was located in a former supply closet.  While it may have been within Dr. Allison's discretion to reorganize his cabinet,

this reorganization did have an adverse impact on Dr. Keller's employment with APS. The fact that she continued to receive the same benefits and salary through the end of the year is insufficient to show that there was no adverse employment decision under 10th Circuit law. *Sanchez* at 532.

Plaintiff has also raised a genuine issue of material fact regarding her allegations of constructive discharge. Constructive discharge exists when "the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign." *Derr v. Gulf Oil Corp.*, 796 F.2d 340, 344 (10th Cir. 1986). Plaintiff has offered sufficient evidence to show that her removal from human resources was a demotion. Again, her new position provided her no job title, no official responsibilities, and an office in a former supply closet. When this new position was appraised for salary purposes, Dr. Keller learned that she would take a 55% reduction in her salary. This would mean she would be remunerated at a lesser level than if she were to retire. While it may be true that Plaintiff was not entitled to remain at the salary level she previously enjoyed, a jury could rationally construe the prospect of continuing to work with no job description or responsibilities and at a salary which provides less than her retirement benefits as "so difficult that a reasonable person in the employee's position would feel compelled to resign." *Derr* at 344.

That Dr. Keller was not necessarily entitled to continued employment beyond the 1998-1999 school year does not preclude her from showing that her alleged constructive discharge was an adverse employment decision. First, the status of Dr. Keller's continued employment with APS is itself a fact in dispute. While new Superintendents are entitled to restructure their boards, deposition testimony alleges that Cabinet level employees are rarely, if ever, removed pursuant to

this power. Rather, APS employees continue on from year to year through a routine acceptance of "renewals," unless there is cause to terminate employment. The fact that Dr. Keller signed a new contract on an annual basis does not render her alleged demotion and constructive discharge non-adverse to her employment at APS.

Given the facts of this case, Plaintiff's failure to seek other positions within APS does not affect this analysis. The Supreme Court has held that a plaintiff need not apply for a job if such an application would have been futile. *Bhd. of Teamsters v. United States*, 431 U.S. 324, 365-366 (1977). ("When a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application.") Dr. Keller has testified that she was informed by Dr. Allison that she had fallen into disfavor with the Board, and that it was in her best interests to find a low-level, low-profile position somewhere outside of APS. Attempting to find a position comparable to her prior one was not feasible under these alleged circumstances, and not required under Supreme Court precedent.

By demonstrating the circumstances of her alleged demotion and constructive discharge, Plaintiff has fulfilled her burden of showing an adverse employment action against her and has thus established a *prima facie* case.

C.      Plaintiff's Treatment Compared to Others in Her Class

There are a variety of methods a plaintiff may use to meet the fourth prong of the *prima facie* case. *EEOC v. Horizon/CMS Healthcare Corp.*, 220F.3d 1184 at 1195, n.6. "One of those ways in a discriminatory discharge case is simply by showing that the job was not eliminated. 'The firing of a qualified minority employee raises the inference of discrimination because it is facially

illogical for an employer to randomly fire an otherwise qualified employee and thereby incur the considerable expense and loss of productivity associated with hiring and training and replacement,'" *Ortiz v. Norton*, 254 F.3d 889 (10th Cir. 2001) (citing *Perry v. Woodward*, 119 F.3d 1126, 1140).

Plaintiff has shown that after being allegedly demoted, the position of Assistant Superintendent of Human Resources remained unfilled for several months, and was not filled until two rounds of interviews were completed. Under 10th Circuit law, these facts alone are sufficient to meet the requirement for fulfilling the fourth prong of her *prima facie* case.

II.    <u>Defendants' Non-discriminatory Reasons for the Alleged Actions Toward Plaintiff</u>

Defendants argue that Dr. Keller's Title VII, ADA, ADEA, and NMHRA claims are without merit because Defendants had legitimate, nondiscriminatory reasons for their actions toward Plaintiff. After Plaintiff has established a prima facie case, the burden shifts to the employer to offer a legitimate nondiscriminatory reason for the adverse employment decision. Once this reason has been stated, the burden returns to the plaintiff, who must show that "'there is a genuine dispute of material fact as to whether the employer's proffered reason for the challenged action is pretextual — i.e., unworthy of belief.'" *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (citations omitted). Such a showing of pretext is required for surviving summary judgment.

Here, Defendants argue that the legitimate nondiscriminatory reason for Dr. Keller's demotion and subsequent removal are unrelated to her age, gender, or disability. Rather, they claim that it was within APS authority to replace Dr. Keller for the purpose of bringing in new

staff members.  Particularly, the motion argues that Dr. Allison sought to bring in staff members who did not have work experience in the New Mexico School District.

It is possible that an organization would seek to replace a highly experienced staff person who possesses distinguished credentials with a less experienced person who may have a fresh outlook on issues in human resources or education.  Thus, Defendants have stated a legitimate nondiscriminatory reason for Dr. Keller's demotion.    The burden then shifts to Dr. Keller to show that this explanation is pretextual.

"Pretext can be shown by 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'"  *Id.* (citations omitted).  Here, the record clearly shows a string of inconsistencies, incoherencies, and contradictions in Defendants' explanations for Dr. Keller's demotion.   First, Dr. Allison told Plaintiff that she was losing her position because the Board was not in favor of retaining her.  He then testified in deposition that APS needed new employees who had experience outside the District of New Mexico.  Later, he stated that Dr. Keller was demoted because she herself requested to be removed from her position as head of human services.  Finally, a Board Member testified that Dr. Keller wanted her removed and they capitulated.    This string of contradictory explanations alone gives rise to a genuine dispute of material fact as to whether the reasons offered by Defendants are pretextual.  By further proffering a record of allegations of Dr. Keller's hiring of and inappropriate interest in younger female employees, Plaintiff has met her burden of showing a genuine dispute of material fact on the true reasons for her dismissal.   Thus, summary judgment is

inappropriate at this time.

III.    Plaintiff's 42 U.S.C. § 1983 Claims

    A.    Comprehensive Remedial Scheme

Plaintiff's § 1983 claim asserts that she suffered violations of her rights under the Equal Protection Clause. The complaint does not specify whether these rights were violated by discrimination on the basis of sex, disability or age. To the extent that the claim is premised on age discrimination, it must fail, as § 1983 cannot be used to redress such wrongs.

"It is well settled that § 1983 is 'a generally and presumptively available remedy for claimed violations of federal law.' Nonetheless, Congress can foreclose recourse to § 1983 'either by express works or by providing a comprehensive alternative enforcement scheme.'" *Padilla v. School Dist. No. 1*, 233 F.3d 1268, 1272 (10th Cir. 2000). The 10th Circuit has explicitly held that "age discrimination claims brought under § 1983 are preempted by the ADEA." *Migneault v. Peck*, 158 F.3d 1131, 1140 (10th Cir. 1998), *rev'd on other grounds*, 204 F.3d 1003 (10th Cir. 2000). Thus, to the extent that Plaintiff's § 1983 claim is premised on age discrimination, it must be dismissed. The same would be true if Plaintiff's § 1983 claims were based solely on violations of Title VII. Section 1983 "cannot be used to assert the violation of rights created only by Title VII." *Allen v. Denver Pub. Sch. Bd.,* 928 F.2d 978 (10th Cir. 1991). However, in *Notari v. Denver Water Dep't*, 971 F.2d 585 (10th Cir. 1992), the Tenth Circuit noted that a § 1983 claim for gender discrimination could stand if founded on rights that exist independently of Title VII. As Plaintiff asserts that she suffered gender discrimination in violation of the Equal Protection Clause, her § 1983 claim may be maintained to this extent.

The Tenth Circuit has been silent on the issue of whether § 1983 claims may be founded on allegations of disability discrimination. *Goldman v. Colorado Territorial Correctional Facility,* 67 F.3d 547, 547 fn.6 (10th Cir. 1995). ("Furthermore, because we dismiss Plaintiff's Section 1983 claim for failure to allege personal participation, we need not decide whether a plaintiff may allege a Section 1983 claim based on a violation of the ADA.") Two appellate courts that have ruled on the matter have found that the ADA provides a comprehensive scheme to redress disability discrimination, thus preempting claims under § 1983. *Alsbrook v. City of Maumelle,* 184 F.3d 999, 1011 (8th Cir. 1997); *Holbrook v. City of Alpharatta*, 112 F.3d 1522 (11th Cir.1997). However, a number of district courts in other districts have allowed similar claims to proceed, *see, e.g., Campbell v. City University Construction Fund*, 1999 WL 435132 (S.D.N.Y. June 25, 1999); *Essen v. Board of Educ. of the Ithaca City School District*, 1996 WL 191948 (N.D.N.Y. April 15, 1996) (finding no preemption, but dismissing disability claim on merits); *Baumgardner v. County of Cook*, 108 F.Supp.2d 1041 (N.D. Ill. 2000).

In *Baumgardner*, the Court examines at length the preclusive effect of cases brought simultaneously under § 1983 and the ADA, and concluded that "Congress did not intend for the ADA to foreclose private claims alleging constitutional violations brought under §42 U.S.C. 1983." *Id.* at 1044. The Court's thorough discussion of the ADA's statutory language and legislative history indicate that Congress intended the ADA to supplement, not replace, other causes of action. *Id.* at 1045. *Baumgardner* also found that "case law also supports the Court's holding that the ADA does not preempt other causes of action, specifically § 1983 claims arising from violations of the Constitution and other federal laws." It went on to say that the Supreme Court had only found two circumstances in which the enforcement mechanisms of federal statutes

were so comprehensive and elaborate as to foreclose a § 1983 claim alleging violations of the same federal statute. *See Middlesex County Sewerage Authority v. National Sea Clammers Assoc.*, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981); *Smith v. Robinson*, 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984).

In *Smith*, the Supreme Court found that the Education of the Handicapped Act ("EHA") foreclosed simultaneous suits under § 1983. However, Congress was quick to respond to *Smith* by expressing that it did not intend to foreclose § 1983 actions under the EHA. "First, Congress amended a provision to allow for attorney's fees under the EHA, then it amended the EHA with a provision that clearly rejected the Court's interpretation of the EHA as the exclusive avenue to pursue constitutional claims for a free education to disabled children." *Baumgardner* at 1048 (*citing Board. of Educ. v. Diamond*, 808 F.2d 987 (3rd. Cir.1986)).

> The EHA and the ADA share strong similarities in both the language of the provisions allowing claims to be brought under other causes of action, and in the protective nature of the statute, that is, the protection of the rights of disabled individuals. Because of these important similarities, the Court is persuaded that Congress intended the ADA to allow § 1983 claims to be brought alleging Constitutional and other federal statutory violations, just as it intended the EHA to allow § 1983 claims to be brought.

*Baumgardner* at 1048. This Court is persuaded by the reasoning of *Baumgardner*. Based on this analysis, and in light of the parallel reasoning behind the Tenth Circuit's allowance of simultaneous Title VII and § 1983 claims based on gender discrimination, this Court finds preemption to be inadequate grounds for dismissing Plaintiff's § 1983 equal protection claim based upon disability discrimination.

B.      Qualified Immunity

Qualified immunity is a defense that shields government officials who perform discretionary functions from liability for civil damages. *Harlow v. Fitzgerald*, 457 U.S. 800 (1982). School boards and school officials, including Defendants, perform discretionary functions and are thus entitled to assert the defense of qualified immunity.

In order for a plaintiff to overcome a claim of qualified immunity, she must, *inter alia*, show that the constitutional or statutory rights the defendant allegedly violated were clearly established at the time of the conduct in question. *Davis v. Scherer,* 468 U.S. 183, 197 (1984). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Medina v. City and County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992).

In *Perry v. Woodward,* 199 F.3d 1126 (10th Cir. 1999), the Tenth Circuit clearly stated that a plaintiff was not required to show that she was replaced by a member of an unprotected class to establish intentional discrimination. *Id.* at 1137. Prior to *Perry*, however, the Tenth Circuit held to the contrary. *See Schwager v. Sun Oil. Co. of Penn.*, 591 F.2d 58, 61 (10th Cir. 1979). While *Perry* clearly established that one can commit discrimination by replacing an employee who is a member of a protected class with another member of the same protected class, this was not clearly established prior to the announcement of *Perry*.

*Perry* had yet to be announced when Defendants discharged Dr. Keller and subsequently replaced her with Ms. Jones. Therefore, Plaintiff's right at the time of her discharge was not so clearly established such that a reasonable official would understand that the discharge violated her rights. *Mick v. Brewer*, 76 F.3d 1127 (10th Cir. 1996). Plaintiff's §1983 claims must

accordingly be dismissed.

IV.     Plaintiff's Contract Claims and Temporal Scope of Damages

Plaintiff appears to make two separate contract claims.  First, she argues that the demotion during the 1998-1999 school year was a breach, resulting in emotional damages.  Next, she claims that her damages are not limited to the 1998-1999 school year.  The court will deal with each claim in turn.

A.     Emotional Distress Damages

Emotional distress damages may only be recovered for breach of an employment contract upon a "showing that the parties contemplated damages for emotional distress at the time the contract was made." *Bourgeous v. Horizon Healthcare Corp.,* 117 N.M. 434, 440, 872 P.2d 852, 858 (1994).  "Under the contemplation of the parties test, the inquiry is not probability of occurrence, but whether the contract implicitly or explicitly allocates the particular kind of loss to the defendant." *Flores v. Baca*, 117 N.M. 306, 312, 871 P.2d 962, 968 (1994).  Plaintiff's employment contract did not explicitly allocate emotional distress damages to the defendants.  Thus, the inquiry is limited to whether there was implicit allocation of such liability.   Liability for emotional distress damages may only be implicitly allocated "[w]here the contract is personal in nature and the contractual duty or obligation is so coupled with matters of mental concern or solicitude, or with the sensibilities of the party to whom the duty is owed, that a breach of that duty will necessarily or reasonably result in mental anguish or suffering[.]" *Id.* at 311.

The Tenth Circuit has not ruled on whether employment contracts are personal in nature for purposes of this analysis.  Plaintiff offers the affidavit testimony of Dr. Rosalie Perea, which

suggests that the parties contemplated emotional distress damages when they entered into Plaintiff's employment contracts. Specifically, Dr. Perea discusses the Employee Assistance Program which addresses the emotional distress employees experience during demotions, reassignments, and terminations. Thus, whether the parties foresaw, contemplated, or expected emotional distress damages when Plaintiff signed her contract remains a genuine issue of material fact, rendering summary judgment inappropriate at this juncture.

B.    Temporal Scope of Damages

NMSA 1978 § 22-10-11(E) states that "a person employed by contract pursuant to this section has no legitimate expectation of reemployment, and no contract entered into pursuant to this section shall be construed as an implied promise of continued employment pursuant to a subsequent contract." Plaintiff concedes that her contract claim damages are limited to the 1998-1999 school year, and the Complaint does not seek contract damages beyond the 1998-1999 school year. However, Plaintiff does not concede that her damages must be limited to 1998-1999 for her claims under the ADA, ADEA, Title VII, and NMHRA.

In *Walker v. Ford Motor Company*, 684 F.2d 1355 (11th Cir. 1982), the Eleventh Circuit found that fixed-term contracts in the education field do not preclude recovery of backpay in the context of discriminatory discharge:

> Generalizing these holdings to a broad rule of Title VII damages, we conclude that the proper allocation of proof in cases involving fixed-term contracts is that a plaintiff must initially introduce some evidence showing that the economic injury resulting from the discharge extended beyond the employment term. As in the teacher discharge cases, this proof may consist of no more than a showing that the particular plaintiff's contract had been renewed in the past, that contracts of similarly situated employees had been renewed, or that the employer had made a promise of continued employment. Once the plaintiff carries this burden, and thus . . . establishes the damages resulting from the discriminatory acts, then the burden shifts to the defendant

to show by a preponderance of the evidence that the plaintiff would not have remained in employment beyond the contract term.

*Id.* (citing *Avery v. Homewood City Board of Education,* 634 F.2d 337 (5th Cir. 1982), *cert. denied* 461 U.S. 943 (1983)).  Defendants assert that *Walker* is inapplicable because it did not involve a fact pattern where, as here, continued expectation of employment was limited by state statute.  Federalism concerns cut against this argument.  If federally instituted anti-discrimination programs such as the ADA could be circumvented by reliance on state statutes which limit the expectation of continued employment, employers who are protected by such state statutes would not be held accountable for their acts found to be discriminatory under federal law.

Given that federal anti-discrimination laws are meant to provide redress to at-will employees who have no legitimate expectation of continued employment based on employment contracts, certainly the same protection is meant to be afforded to fixed-term employees who have been regularly rehired.  Furthermore, a plaintiff subject to an annual contract is similarly situated to a new applicant for an employment opportunity — while neither have an expectation of employment, both parties have legitimate expectations to not be excluded from the pool of applicants on the basis of gender, age, or disability.  The case is even stronger where, as here, Plaintiff can show that she was re-hired for four years in a row prior to her transfer to RDA and subsequent discharge, that she was the only APS cabinet member whose employment contract was not renewed by Defendants, and that she was the eldest member of Defendant Allison's cabinet when she was relieved of her duties.  These alleged facts meet the standards set forth in *Walker v. Ford Motor Company*, 684 F.2d 1355 (11th Cir. 1982) and *Avery v. Homewood City Board of Education,* 674 F.2d 337 (5th Cir. 1982), and entitle Plaintiff to pursue her claims for

damages beyond the 1998-1999 contract under the ADA, ADEA, Title VII, and the NMHRA.

V.    Timeliness of Plaintiff's Claims under Title VII, ADA, ADEA, and NMHRA

Defendants' final grounds for seeking summary judgment are based on the timeliness of the filing of the claims.  The NMHRA requires that administrative charges of discrimination must be filed within one hundred and eighty (180) days after an allegedly discriminatory act is committed.  NMSA 1978, § 28-1-2(A).  Title VII, the ADA, and the ADEA all require that administrative charges of discrimination be filed within three hundred (300) days after the alleged discriminatory act.  42 U.S.C. § 2000e-5(e)(1) (Title VII); 42 U.S.C. § 12117(a) (ADA); 29 U.S.C. § 626(d)(2) (ADEA).  If a plaintiff does not meet these timing deadlines, his or her claims under those respective statutes may not proceed.  *Robbins v. Jefferson County Sch. Dit. R-1,* 186 F.3d 1253 (10th Cir. 1999) (Title VII); *Aronson v. Gressly*, 961 F.2d 907 (10th Cir. 1992) (ADEA); *Schmitt v. Beverly Health and Rehab. Servs.*, 962 F. Supp. 1379 (D. Kan. 1997) (ADA); *Jaramillo v. J.C. Penny Co.*, 102 N.M. 272 (Ct. App. 1985) (NMHRA).

Failing to file within the statutory period is not a complete bar to recovery.  Rather, if a plaintiff can show a "continuing violation," relief is not time-barred.  *Purrington v. University of Utah*, 996 F.2d 1025, 1028 (10th Cir. 1993).  Under the continuing violation doctrine, a combination of discriminatory acts are treated as one continuous act that ends within the limitations period.  *Id.*  To invoke this doctrine, a plaintiff must show a series of related acts against a single individual, one or more of which falls within the limitations period.  *Mascheroni v. Board of Regents of Univ. of Cal.*, 28 F.3d 1554, 1561 (10th Cir. 1994).  The Court must determine "whether [these] related acts constitute a continuing violation," which requires a

showing of a "dogged pattern of discrimination, as distinguished from isolated and sporadic outbursts." *Bennett v. Quark, Inc.* _____ F.3d _____, 200 WL 876381, 4 (quoting *Purrington v. University of Utah*, 996 F.2d 1025, 1028 (10th Cir. 1993) (citations omitted). The factors relevant to this determination are:

> (1) the subject matter of the acts — whether the violations constitute the same type of discrimination; (2) the frequency of the acts; and (3) the permanence of the acts — whether the nature of the violations should trigger an employee's awareness of the need to assert her rights and whether the consequences of an act would continue even in the absence of a continuing intent to discriminate.

Id., (citing *Bullington v. United Airlines, Inc.*, 186 F.3d 1301, 1310 (10th Cir. 1999). The Court must "look to the third factor, permanence, because the continuing violation doctrine is premised on the equitable notion that the statute of limitations should not begin to run until a reasonable person would be aware that her rights have been violated." *Robbins v. Jefferson County School Dist. R-1*, 186 F.3d 1253, 1257 (10th Cir. 1999).

Plaintiff has met all three of these factors. First, while Plaintiff alleges three different types of discrimination, and suspects that the last act of discrimination was primarily related to her breast cancer diagnosis, she also maintains that her gender, age, and the combination of her gender and age were factors in her salary cut. The second and third factors of the *Bullington* criterion are closely related. The facts relevant to those analyses are as follows: Dr. Keller was allegedly notified of her pending discharge from her position as head of human resources on July 8, 1998, was nonetheless given a contract for the position of executive director of human resources in September, 1998, and was moved to a job in RDA in October, 1998. Plaintiff announced her diagnosis of breast cancer to Dr. Allison in March 1999, and was given her salary

readjustment for the following year later that month. She then filed her charge of discrimination on June 11, 1999. While this filing did not fall within either one-hundred and eighty or three-hundred days of the initial act of notifying her of her pending removal, it did occur within one-hundred and eighty days of Plaintiff coming to know that her salary readjustment would be a fifty-five percent (55%) reduction.

While Plaintiff may have initially believed that she had been "fired" as of July 8, 1998, Defendants' act of offering Plaintiff a contract for a job essentially identical to the one she was allegedly on notice for removal from could reasonably lead her to think she was no longer being discriminated against, and that her job was not necessarily in danger in a permanent manner. That Plaintiff asked if she should still go to RDA in October when her Human Resources position had not been filled is further evidence that she was uncertain of her status in APA, and may not have been on notice of potential discrimination until she received her salary reduction. At a minimum, this is a question of fact that is not fully clarified by Plaintiff's deposition testimony regarding her impressions of Dr. Allison's motivations on July 8, 1998 for putting her on notice of her future demotion. Furthermore, at the time of her notification of her pending demotion, Plaintiff was given information that, at a minimum, dissuaded her from suspecting a potentially discriminatory motivation behind her discharge; she was told that she was being demoted because the board was unhappy with her, and she spent time pondering what she had done to fall into their disfavor. It appears, then, that the Plaintiff had not began to truly grasp the possibility of discrimination until the time of her salary recalculation. Given the conflicting messages Dr. Keller received over the course of the year, a reasonable person in her position would not have been aware that her rights have been violated. *Robbins* at 1257.

While Dr. Keller's salary readjustment does flow from the earlier demotion, the readjustment was a second, related, independent act.  This set of events suggests that the discharge may have been part of a continuing course of discriminatory conduct on the basis of gender, sex and age.  Because this act occurred within the statutory limitations period, Plaintiff's claim is timely and will not be dismissed.

## CONCLUSION

It is therefore ordered that Defendant's Amended Motion for Summary Judgment **[Doc. No. 42]** is hereby **GRANTED IN PART** as to Plaintiff's claims under 42 U.S.C. § 1983.  All other claims are **HEREBY DENIED.**

Dated this 20th day of November, 2001, in Santa Fe, New Mexico.


Martha Vázquez
U. S. District Judge


Attorney for Plaintiff
Paul Kennedy, Mary Y.C. Han

Attorney for Defendant
S. Charles Archuleta